FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA, FLORIDA

2016 DEC 15   AM 10: 02

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* | ) | |
| **DENNIE GOSE and BRENT BERRY** | ) | **CASE NO.:** |
| | ) | $8:16$-$CV$-$3411$-$T$-$17AEP$ |
| **Plaintiffs,** | ) | |
| | ) | **(FILED UNDER SEAL)** |
| v. | ) | |
| | ) | |
| **NATIVE AMERICAN SERVICES** | ) | |
| **CORPORATION and GREAT** | ) | |
| **AMERICAN INSURANCE GROUP,** | ) | |
| **INC. d/b/a GREAT AMERICAN** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### *QUI TAM* COMPLAINT

---

This is an action brought by Relators Dennie Gose and Brent Berry ("Relators") on

behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. §

3729, *et seq.* ("FCA"). In support thereof, Relators allege the following:

1.      Beginning in 2012, Defendants Native American Services Corporation

("NASCO") and Great American Insurance Group, Inc., d/b/a Great American Insurance

Company ("GAIC") (collectively "Defendants") undertook a deceptive and fraudulent scheme

designed solely to capture construction business set aside by the federal government specifically

for small businesses under the Small Business Administration's ("SBA's") 8(a) program, and, in

particular, for small businesses owned by veterans who became disabled while serving in the

United States military.



2.      As detailed herein, Defendant NASCO is not a small business, it is not owned by a service-disabled veteran, and therefore it was ineligible to receive the millions of dollars paid by the Government pursuant to the set-aside contracts and task orders at issue in this case.

3.      In order to gain access to the lucrative set-aside contracts and task orders, Defendants NASCO and GAIC conspired to acquire an 8(a)-qualified small business, which was also a Service-Disabled Veteran-Owned Small Business Concern ("SDVOSBC"), turn it into a shell company, and control it in all aspects of its operations while collecting nearly all of the profits and financial benefits of the improperly obtained set-aside task orders. Defendants attempt to conceal the fraud by submitting false certifications to the United States related to the company's 8(a)- and SDVOSBC-eligibility to receive the set-aside contracts and task orders.

4.      Since 2012, and continuing through the present, Defendants have been depriving the United States of the benefit of its set-aside contracts and task orders, which are intended to foster the growth and development of small businesses owned by economically and socially disadvantaged individuals, as well as veterans injured in the service of their country.

5.      The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015 and $10,781 to $21,563 for each such claim submitted after November 2, 2015, and three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service on the defendants. The complaint remains under seal while the Government

conducts an investigation of the complaint's allegations and determines whether to join the action.

6.      Pursuant to the FCA, Relators seek to recover on behalf of the United States damages and civil penalties arising from Defendants' purposeful submission of false and fraudulent claims and certifications to the Government.

## PARTIES

7.      The real party in interest in this case is the United States (also referred to herein as the "Government"). The Government, through the Small Business Administration's ("SBA's") 8(a) program and the Veterans' Administration's ("VA's") SDVOSBC program, solicited proposals from 8(a)-qualified businesses and SDVOSBCs, and awarded the contracts and task orders at issue in this action. As described more fully below, the Government set aside those contracts for qualified 8(a) businesses and SDVOSBCs in an effort to foster the development of small businesses owned by economically and socially disadvantaged individuals, and by veterans who became disabled while serving in the U.S. military.

8.      Relator Dennie Gose is a resident of Truth or Consequences, New Mexico. He is a licensed architect with 40 years' experience in architectural design and construction. He is currently the Chief Executive Officer ("CEO") and 51% shareholder of DWG & Associates, Inc. ("DWG"), a qualified federal construction contractor, which maintained an office in Clearwater, Florida. Mr. Gose served in the Vietnam War as a Chief Warrant Officer. He suffered the loss of his leg during combat.

9.      Relator Brent Berry is a resident of South Jordan, Utah. He is a business administrator who has served in various finance and business administration roles for 23 years. Mr. Berry is an MBA graduate of Cornell University and has been in the construction industry

for 20 years. Mr. Berry worked as DWG's Chief Financial Officer ("CFO") from 2002 until 2012. He currently works as the Controller for MJ Mechanical in North Salt Lake, Utah.

10.     Defendant NASCO is headquartered at 53285 Silver Valley Rd., Kellogg, Idaho 83837. Formed in 1998, it is a privately-owned construction management company that specializes in federal contracts, generating nearly $100 million in annual revenues. Defendant NASCO maintains a regional office in Jacksonville, Florida.

11.     Defendant GAIC is headquartered at 301 E 4th Street in Cincinnati, Ohio 45202. Formed in 1872, it is a wholly owned subsidiary of American Financial Group, Inc., a publicly-traded holding company also based in Cincinnati.

## JURISDICTION AND VENUE

12.     This action arises under the FCA. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, transacted business in and/or have committed the alleged acts in the Middle District of Florida.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because all of the Defendants can be found in, reside in or have transacted business in the Middle District of Florida, and many of the alleged acts occurred in this District. Relators know of no other FCA complaints that have been filed against Defendants alleging the same or similar actions. Additionally, Relators learned of all of the conduct underlying these allegations through personal experience. Accordingly, Relators are original sources as defined in

4

31 U.S.C. § 3730(e)(4)(B). Relators made voluntary disclosures to the United States prior to the filing of this lawsuit.

**REGULATORY OVERVIEW**

**The Small Business Administration's (8) a Program**

15.     In 1998, Congress enacted section 8(a) of the Small Business Act. The purpose of the 8(a) program is "to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1.

16.     The SBA is authorized to enter into contracts with other Federal agencies, and to contract the performance of those Federal contracts to qualified 8(a) program participants. 13 C.F.R. § 124.501(a). The 8(a) contracts may be either "sole source" awards, or awards won through bidding with other 8(a) program participants. *Id.*

17.     To qualify as 8(a)-certified, an applicant must be a small business (as defined by 13 C.F.R. § 124.102), which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States, and which demonstrates potential for success. 13 C.F.R. § 124.101.

18.     Only 8(a)-certified businesses can bid on or be awarded 8(a) set-aside or 8(a) competitive contracts. 13 C.F.R. § 124.508(c), 13 C.F.R. § 124.501(g).

**The Service-Disabled Veteran-Owned Small Business Procurement Program**

19.     The Veterans Benefit Act of 2003 (the "Act") created a procurement program for small business concerns owned and controlled by service-disabled veterans or SDVOSBCs. 48 C.F.R. § 19.1401(a). The procurement program's purpose is to provide federal contracting assistance and opportunities to SDVOSBCs in recognition for their owners' service to their country. 48 C.F.R. § 19.1401(b).

5

20.     Under the Act, government contracting officers may award contracts and task orders based on bids solicited only from SDVOSBCs. 15 U.S.C. § 657f; *see also* 48 C.F.R. § 6.206 ("To fulfill the statutory requirement of the [Act], contracting officers may set-aside solicitations to allow only [SDVOSBCs] to compete"). Contracts and task orders whose solicitations limit participation to SDVOSBCs are generally referred to as being "set-aside".

21.     Contracting officers may restrict competition to SDVOSBCs so long as they have a reasonable expectation that at least two SDVOSBCs will submit bids, and that the award can be made at a fair market price. 15 U.S.C. § 657f.

22.     A small business is potentially eligible to bid as an SDVOSBC on set-aside contracts and task orders if it meets the following ownership, control, and size criteria:

a.     The business is majority-owned (not less than 51%) by one or more service-disabled veterans;

b.     One or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran, controls the management and daily business operations; and

c.     At the time of the contract offer, the business is "small" within the size standard corresponding to the North American Industry Classification System ("NAICS") code assigned to the industry.

13 C.F.R. §§ 125.8, 125.11.

23.     To satisfy the ownership criteria, a small business concern is "owned" by service-disabled veterans when one or more service-disabled veterans has direct and unconditional ownership of that concern. 13 C.F.R. § 125.12(a). In the case of partnerships and limited liability

companies, service-disabled veterans must own at least 51% of each class of partnership or membership interest. 13 C.F.R. § 125.12(b).

24.     To satisfy the control criteria, a small business concern is "controlled" by service-disabled veterans when one or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) conducts both the concern's long-term decision-making and its day-to-day management and administration of business operations. 13 C.F.R. § 125.13(a).

25.     To satisfy the size criteria, a small business concern is "small" and therefore eligible for federal small business programs and preferences when it meets the SBA's size standards. 13 C.F.R. § 121.101(a). These standards have been developed for different industries under NAICS. *Id.* For industrial, commercial, and institutional building construction, for example, the NAICS size standard is $36.5 million in annual receipts. 13 C.F.R. § 121.201. An entity that, in conjunction with its affiliates (as described below), has annual receipts greater than $36.5 million is ineligible to compete for, or to be awarded, SDVOSBC set-aside contracts for industrial, commercial, and institutional building construction. *Id.*

26.     An SDVOSBC may have affiliates, provided that the aggregate size of the SDVOSBC and all of its affiliates is still "small" as defined by the regulations. 13 C.F.R. § 125.15. For example, a small business concern owned by service-disabled veterans is not an SDVOSBC when it is affiliated with an entity that generates more than $36.5 million a year in revenue on its own or more than $36.5 million when combined with the revenue of the small business concern and/or other affiliates.

27.     Entities are "affiliates" of each other when one entity controls, or has the power to control, the other. 13 C.F.R. § 121.103(a). Affiliation is determined by the totality of the

circumstances, considering factors such as ownership, management, previous relationships or ties to the other entity, and contractual relationships. *Id.*

28.    In particular, entities may be affiliated through common management when one or more of the officers, directors, managing members, or partners who control the board and/or management of a concern also control the board and/or management of another concern. 13 C.F.R. § 121.103(e).

29.    For purposes of affiliation, control can be both affirmative and negative. "Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." 13 C.F.R. § 121.103(a)(3).

30.    When the SDVOSBC is the prime contractor on an SDVOSBC general construction contract, it may subcontract part of the contract, provided that it spends at least 15% of the cost of contract performance incurred for personnel on the concern's employees or the employees of other SDVOSBCs. 13 C.F.R. § 125.6(a)(3). When the SDVOSBC is the prime contractor on an SDVOSBC contract for construction by special trade contractors, it must spend at least 25% of its cost of performance for personnel on its employees or the employees of other SDVOSBCs. 13 C.F.R. § 125.6(a)(4).

31.    In sum, an SDVOSBC must meet several requirements to submit an offer on a set-aside contract. Specifically, the SDVOSBC must represent: (a) that it is indeed an SDVOSBC; (b) that it is "small" as defined by the regulations; (c) that it will meet the percentage of work cost expenditures for subcontracting; and, if applicable, that it is an eligible (d) joint venture and/or (e) non-manufacturer. 13 C.F.R. § 125.18(a).

32.     SDVOSBC status is an express condition of payment for SDVOSBC set-aside contracts. Each and every SDVOSBC set-aside contract contains provisions specifying that: "Offers are solicited only from service-disabled veteran-owned small business concerns. Offers received from concerns that are not service-disabled veteran-owned small business concerns shall not be considered. Any award resulting from this solicitation will be made to a service-disabled veteran-owned small business concern." 48 C.F.R. § 52.219-27(c).

33.     To protect the integrity of the SDVOSBC program, fraud involving the program is expressly actionable under the FCA. 13 C.F.R. § 125.32(e)(2).

## ALLEGATIONS

### Defendants Intentionally Defrauded the SBA's 8(a) Program and the VA's SDVOSBC Program

34.     In 2012, Defendants NASCO and GAIC conspired to acquire an 8(a)-qualified business that was also an SDVOSBC, turn it into a shell company, and control it in all aspects of its operations. Defendants engaged in this activity in order to gain access to federal set-aside task orders for which Defendant NASCO was ineligible. Defendants' fraudulent scheme is laid out in more detail below.

### DWG & Associates, Inc.

35.     Relator Gose, currently 68 years old, served in the Vietnam War as a Chief Warrant Officer and helicopter pilot. Relator Gose flew more than 100 troop insertion and extraction, resupply, command and control, and gunship fire and support missions in the Republic of South Vietnam. During his final mission in August 1968, Relator Gose's helicopter came under enemy fire. Relator Gose sustained severe injuries when a bullet ripped through his helicopter's fuselage. Although Relator Gose was able to land safely, his injuries resulted in the loss of his right leg below the knee. The United States recognized Relator Gose's service by

9

awarding him multiple medals, which included Air Medals, the Purple Heart and the Vietnamese Cross of Gallantry.

36.   Upon completing his military service, Relator Gose obtained an architectural license and pursued a career in building construction and design. He founded his own company, DWG & Associates, Inc. ("DWG"), in 1995 and later incorporated it in 2002.

37.   Shortly after its incorporation, DWG acquired CDR Enterprises, which brought Relator Berry to the company. Relator Berry became CFO and 49% shareholder of DWG. Relator Gose held the role of DWG's CEO and 51% shareholder.

38.   In March 2004, DWG was accepted into the SBA's 8(a) program. (*See* Exhibit A). DWG began competing for 8(a) and SDVOSBC federal construction and design-build contracts, primarily with the Department of Defense. The company was very successful in winning a range of federal set-aside multi-year task order contracts. DWG benefitted greatly from Relator Gose's architectural background, as it did not have to subcontract with outside architecture firms. Over the years, DWG grew to have approximately 200 employees and $80 million in government contracts. Although based in Colorado, DWG expanded to have regional offices in Lompoc, California; Las Vegas, Nevada; and Clearwater, Florida.

39.   On January 1, 2010, DWG officially outgrew its small business status and could no longer compete for new 8(a) or SDVOSBC set-aside contracts. However, the Federal Acquisition Regulation ("FAR") rules allow holders of set-aside task order contracts to continue competing for individual task orders for the length of the original contract for up to five years after it loses 8(a)/SDVOSBC status, as long as the company control does not change hands to a non-qualified firm or individual.

40.     In 2011, Relator Gose became gravely ill. He was no longer able to function well enough to oversee daily company operations. Relator Berry was unable to replace Relator Gose's leadership of the company because his expertise was not in field operations oversight. DWG's managers took on an extreme amount of risk and the company deteriorated financially until it became insolvent.

41.     Virtually all of DWG's contracts were bonded by its surety, Defendant GAIC. As a result, in June 2012, Relator Berry informed Defendant GAIC that DWG was unable to meet its continuing financial obligations to perform its set-aside contracts and was in default of the indemnity agreement with Defendant GAIC. (*See* Exhibit B). Defendant GAIC immediately began making loans to DWG in order to prop the company up while a more permanent solution was sought.

42.     During a May 2012 meeting with Defendant GAIC, Relator Berry proposed the idea of trying to find another 8(a)- and/or SDVOSBC-qualified company to buy DWG and complete its contracts. While Relator Berry searched for an 8(a)- and/or SDVOSBC-qualified business, two non-8(a)-qualified companies reached out to him and expressed interest in working with DWG to complete its contract backlog. One of those companies was Defendant NASCO.

### Introduction of Defendant NASCO

43.     In June 2012, Relator Berry began discussions with Defendant NASCO about DWG's contract backlog. Defendant NASCO expressed interest in assisting DWG with the backlog, and also in working on future task orders under the master contracts DWG already possessed.

44.     On July 12, 2012, Relators, on behalf of DWG, and Defendant GAIC signed a Financing and Debt Reduction Agreement, in which DWG acknowledged that it was in default

on its contracts for which Defendant GAIC issued bonds, and was also in default of its obligations to Defendant GAIC under the agreement of indemnity. (*See* Exhibit C). Through the Financing and Debt Reduction Agreement, Defendant GAIC essentially required Relators' full cooperation in order to earn the continued forbearance on the foreclosure of their assets. Relators were under obligation to pursue and cooperate on revenue sharing arrangements on future contracts; however, they were assured by both Defendants that all future arrangements would be SBA-compliant. After signing the Financing and Debt Reduction Agreement, Relators began to lose all meaningful influence, control, and involvement regarding DWG's operations.

45.    Discussions between DWG and Defendants NASCO and GAIC progressed rapidly. On July 24, 2012, DWG invited Defendant NASCO to submit a proposal for partnering with DWG on fourteen Government contracts. (*See* Exhibit D). Relator Berry specified that the proposals must be compliant with SBA rules. Defendant NASCO quickly responded with an outline of proposed terms for the partnership.

46.    On August 3, 2012, Defendant GAIC sent a letter to Defendant NASCO in which it offered to be the bonding agent in the event Defendant NASCO and DWG worked out a deal. In the letter, Defendant GAIC relayed that it was "favorably intrigued" by the potential partnership between DWG and Defendant NASCO, and that "the most expedient way to keep NASCO's proposal as a viable option would be for [GAIC] to fully underwrite the NASCO account to determine if GAIC would be willing to become NASCO's surety company for at least the short-term." Defendant GAIC suggested that a meeting in Cincinnati the following week might be helpful in solidifying the partnership between DWG and Defendant NASCO. (*See* Exhibit E).

12

47.     Following the August 3, 2012 letter, Defendants GAIC and NASCO made plans to meet in Cincinnati on August 8, 2012 to discuss the potential DWG-NASCO partnership.

48.     On August 6, 2012, Defendant GAIC sent a letter to Defendant NASCO outlining its view of the DWG-NASCO partnership based on NASCO's initial proposal to DWG. Defendant GAIC acknowledged that "[t]he ideas we [GAIC] present in this letter have not been vetted by the other interested parties, namely DWG and First National Bank..." but nevertheless began taking an active role in making proposals for the solidification of the partnership. Defendant GAIC proposed that "NASCO become a critical subcontractor to DWG for all existing proposals and subsequent awards to DWG on contracts currently in effect for DWG." (*See* Exhibit F).

49.     On August 8, 2012, Defendants GAIC and NASCO met in Cincinnati to discuss the terms of Defendant NASCO's subcontracting arrangement with DWG. The following people were in attendance:

- **From NASCO:** Rusty Sheppard, Matthew James, Rick Luna, Bill VanCanagan, and Jim Majeskey (Payne Financial)

- **From GAIC:** Gary Dunbar, Fran Plante, Dave Rabe, Dave Kitchin, Mark Vicario, Barry Moore, and Scott Leo

No DWG representatives were present. (*See* Exhibit G).

50.     After the August 8th meeting, negotiations continued to progress rapidly towards solidifying the DWG-NASCO partnership. Both Relators felt continued financial pressure to comply with everything Defendants' asked of them. On August 28, 2012, Relator Berry, on behalf of DWG, and at the direction of Defendant NASCO, authorized the opening of a joint bank account with Defendant NASCO. (*See* Exhibit H).

51.     On September 12, 2012, Relator Berry signed teaming agreements for each of DWG's master task order contracts. Defendant NASCO prepared the teaming agreements, which established a Prime-Subcontractor relationship between DWG and Defendant NASCO. (*See* Exhibit I).

52.     Defendants NASCO and GAIC planned to meet again in late September 2012 in order to finalize the terms of the DWG-NASCO partnership. Relators were not initially informed of the meeting, although they still owned 100% of DWG. Relator Berry eventually found out about the meeting from a DWG employee in the Colorado Springs office. Upon learning of the meeting, Relator Berry consulted with DWG's attorney, David Slaughter, who reached out to Defendant GAIC. After speaking with Defendant GAIC, Mr. Slaughter insisted that he would attend the meeting on behalf of the company.

53.     Relators did not attend and were given no details of what occurred during the September 2012 meeting. Relators eventually received a final copy of the Management and Advisory Services Agreement (the "Agreement"), which had been completed by Defendants at the meeting. Upon receiving the Agreement draft prior to this meeting, Relator Berry attempted to make edits, which, among other things, opposed Defendant NASCO's administration of future contracts. Relator Berry also memorialized his many concerns about whether the Agreement complied with SBA regulations. (*See* Exhibit J).

54.     Relators' concerns about the Agreement were never addressed by Defendants, nor were Relator Berry's corrections incorporated into the final draft. Upon hearing of the terms of the final draft of the Agreement via a telephone call with Defendant GAIC and Mr. Slaughter, Relators again expressed their objections to the content. However, Relators were told they had no choice but to agree with the terms of the Agreement as written. Additionally, around this time,

Defendant GAIC told Relator Berry that the Agreement had been reviewed by its attorneys, who saw no compliance issues with it.

55.     During this time period, Mark Vicario, Defendant GAIC's Vice President of Claims, informed Relator Berry that, effective immediately, his salary would be cut by 60% and his last date of employment would be December 31, 2012. It was made clear to Relator Berry that Defendants did not want him involved in DWG from that point on. Relator Gose was also informed that his salary would be reduced immediately. Relators had no involvement in the compensation decisions.

56.     The final draft of the Agreement provided that 98% of contract proceeds would flow to Defendant NASCO, with the remaining 2% to be paid to Defendant GAIC as a "consulting fee" and leaving DWG with nothing. Relators found this disconcerting, but were under strict orders from Defendant GAIC to cooperate with the terms of the Agreement or risk having the company go completely out of business. Relators were told by Defendant GAIC that as long as they cooperated with Defendants, no one would pursue them personally for DWG's past financial losses, which were in the millions of dollars. Because of Defendant GAIC's leverage over Relators' assets, Relators felt they had no choice but to go along with whatever Defendants requested of them. Defendant GAIC maintains a threat of foreclosure over Relators' assets to this day.

57.     On September 25, 2012, the Agreement was finalized. (*See* Exhibit K). Under Defendant GAIC's direction, DWG had officially retained Defendant NASCO to manage the completion of all of DWG's contracts that were bonded by Defendant GAIC. Defendant NASCO sent letters on behalf of Relator Gose to all of the active contractors on DWG's contracts to let

them know that Defendant NASCO would be assisting DWG in managing the completion of task orders. (*See* Exhibit L).

58.     On November 12, 2012, Defendant NASCO and Relators signed a Right of First Refusal and Option Agreement, which gave Defendant NASCO the option to purchase Relator Gose's common shares of DWG, which total 51% of the common shares of the company. (*See* Exhibit M).

59.     Through the actions described above, Defendants GAIC and NASCO executed a scheme to take complete control of DWG and its existing contracts, along with future 8(a) and SDVOSBC set-aside task orders for which DWG would continue to bid under Defendant NASCO's instruction. Defendants' ongoing fraudulent actions are described in more detail below.

**Relators' Discovery of Defendants' Fraudulent Actions**

60.     As soon as the Agreement was finalized, Defendant NASCO began to make significant changes at DWG, all of which were designed to give Defendant NASCO complete control over the company. DWG's employees were instructed to start reporting to Defendant NASCO's management; over time, the majority of DWG's staff were eventually discharged by Defendant NASCO and replaced with its own employees.  Defendant NASCO took control of DWG's bank accounts, accounting department, human resources, contract administration responsibilities, and virtually all other business administration duties. Relator Gose was given a fixed salary of $125,000 per year, though he retained his 51% ownership of DWG, which was vital to the company's supposed SDVOSBC status. Relator Berry, per the Agreement, elected to sell his 49% ownership in DWG to Defendant NASCO for only $35,000. (*See* Exhibit N).

61.     Additionally, the address of DWG's National Headquarters (2270 La Montana Way, Suite 101, Colorado Springs) became the address listed for Defendant NASCO's "Front Range Headquarters" on Defendant NASCO's website. (*See* Exhibit O).

62.     From the time the Agreement was finalized, Defendant NASCO made every key decision concerning DWG, and signed most—if not all—documents without Relator Gose's knowledge or consent, even though Relator Gose still owned 51% of DWG.

63.     Relator Berry was not pleased with the outcome of the DWG-NASCO deal. He felt uncomfortable with the terms of the Agreement and worried about the future of DWG and Relator Gose. After leaving DWG, Relator Berry kept in regular contact with Relator Gose, though they did not discuss business very often. However, in or around the fall of 2013, Relator Gose told Relator Berry that he heard from a DWG employee that DWG was getting a lot of new work. Relator Gose explained that he was surprised by the news because Defendant NASCO had been telling him the opposite—that DWG was not getting much work at all, and that DWG still owed roughly $20 million to Defendant GAIC, which is why Relator Gose had yet to receive any payments in excess of his $125,000 annual salary.

64.     Following one of those conversations with Relator Gose in fall 2015, Relator Berry decided to do his own research to see how much work was flowing into DWG. He was shocked to find a large number of new set-aside task orders had been acquired by DWG, of which Relator Gose was completely unaware. The new set-aside task orders were valued at more than $75 million. Relator Gose was never involved in the bidding process for DWG's new set-aside task orders.

65.     Since the time of NASCO's takeover of DWG's accounting and management, and particularly since the discovery of the true scale of DWG's new set-aside task orders, Relator

Gose has repeatedly requested financial and managerial information from Defendant NASCO, but Defendant NASCO has either responded with silence or by saying that nothing significant has occurred.

66.     Defendant NASCO has continued to use its complete control of DWG to obtain new set-aside task orders from the Government without ever involving Relator Gose. At Defendant NASCO's direction, DWG—through authority of the master teaming agreement between DWG and Defendant NASCO—issues subcontracts to Defendant NASCO for nearly the entire amount of each set-aside task order award. In this way, Defendant NASCO controls the entirety of each set-aside task order's profit, less the small amount that is necessary to keep the DWG shell company alive and pay Relator Gose's salary. Additionally, per the Agreement, Defendant GAIC receives a percentage of each new set-aside task order award.

67.     Relator Gose has not managed or controlled DWG operations since the Agreement with Defendants was finalized, despite the fact that Relator Gose's active management of the company's operations is essential to DWG's continued status as an 8(a)/SDVOSBC. Once Defendants took control of DWG, DWG became ineligible to bid on new set-aside task orders under its existing master contracts.

68.     The following is a representation of the master contracts that encompass the set-aside task orders on which Defendant NASCO has been fraudulently bidding since the Agreement was finalized:

| Contract Name | Contract Number | Contract Location | Award Date | Set-Aside Type |
|---|---|---|---|---|
| AFCESA SATOC | FA3002-08-D-0018 | CONUS, OCONUS | 7/16/2008 | SDVOSB Award |
| Beaufort MACC | N69450-09-D-1774 | Beaufort MACC | 9/24/2009 | SDVOSB Award |
| USAFA SABER | FA7000-09-D-0020 | USAFA, CO | 8/7/2009 | 8(a) Award |

| USCG RMACC Districts 11 & 13 | HSCG88-10-D-PQQ017 | West and Northwest U.S. | 12/17/2009 | SDVOSB Award |
| USCG RMACC Districts 5 | HScG83-10-D-PCR102 | Mid-Atlantic United States | 12/28/2009 | SDVOSB Award |
| USCG RMACC Districts 7 | HScG82-10-D-PMVA53 | Florida and South Carolina | 2/8/2010 | 8(a) Award |
| Scott AFB MACC | FA4407-09-D-0029 | Scott AFB, Illinois | 9/28/2009 | Small Business Award |
| Mobile District Gulf Coast MATOC | W91278-10-D-0004 | Lower Mississippi, lower Alabama, Florida panhandle | 11/2/2009 | 8(a) Award |
| IL ANG USPFO MATOC | W91SMC-10-D-0007 | Illinois | 3/19/2010 | Small Business Award |
| Front Range SABER | FA2517-10-D-5010 | Colorado and Wyoming, 7 bases | 3/30/2010 | 8(a) Award |
| NPS SABER MATOC | C1274090115 | Arizona, New Mexico, Texas | 9/25/2009 | 8(a) Award |
| USACE SoCal Vertical MATOC | W912-PL-10-D-0008 | Southwest United States | 1/22/2010 | 8(a) Award |
| USACE SoCal VA MATOC | W912-PL-09-D-0055 | Southwest United States | 8/12/2009 | SDVOSB |

69.     The multi-year contracts listed above were awarded when DWG was "small" and therefore 8(a)/SDVOSBC-eligible. DWG continued to be eligible to receive individual task orders under these master contracts for five years beyond the initial contract date, so long as its ownership and/or control did not change hands to non-qualified firms or individuals. The moment Defendant NASCO took control of DWG's operations and managerial responsibilities, DWG became ineligible to receive new set-aside task orders under these contracts. Defendant NASCO—through the DWG shell company—has been fraudulently bidding on new set-aside task orders and improperly collecting federal dollars since September 2012. The scheme has been mutually beneficial to both Defendants, who continue to share revenues from the new set-aside task orders. Defendant GAIC also continues to collect the bond premiums associated with the task order awards.

70.     The fraudulent set-aside task order project locations span several states, including:

- California: Vallejo, Alameda

- Colorado: Colorado Springs, U.S. Air Force Academy, Aurora

- Florida: Cape Canaveral, Fort Myers, Marathon, Islamorada, Hurlburt Field, Eglin Air Force Base

- New Mexico: Albuquerque, Ramah, Carlsbad

- Oregon: Portland, Coos Bay

- Wyoming: F.E. Warren Air Force Base

71.     A complete listing of DWG construction contracts at issue in this Complaint was provided to the Government attendant to this filing. A number of these contracts were administered by DWG's Clearwater, Florida contracting office. Other contracts were not administered by the Clearwater office, but included work which was performed in Florida. The following are illustrative of those contracts:

| Transaction No. | Amount | Dept. | Effective Date |
|---|---|---|---|
| 0B182EA9-D467-37EC-8966-46C5ADB0347A | $1,856,480 | Army | 9/26/14 |
| 7B5674FD-9FF5-4EB8-6A1B-9A478A94AAEO | $378,731 | Army | 2/6/13 |
| D7E422B5-E08C-B54D-5074-AB6B61534AF9 | $293,448 | US Coast Guard | 11/20/14 |
| C5082825-1FFC-14B4-F174-EFC7E378E5F0 | $70,135 | US Coast Guard | 12/24/14 |
| D413B158-A390-423A-B3B3-1289D09EE776 | $366,030 | US Coast Guard | 4/3/15 |
| 0B8B03CC-B36A-47AE-88A4-3C3CBAA63970 | $107,451 | US Coast Guard | 8/31/15 |

72.     To this day, Defendant NASCO continues to submit certifications to the Government through the Online Representations and Certifications Applications ("ORCA")

system on behalf of DWG. Relator Gose is never shown the certifications before they are submitted, nor is he asked to be involved in the certifications' preparation. Each time Defendant NASCO makes a submission through ORCA on behalf of DWG, it certifies that DWG is a SDVOSBC. The name appearing on DWG's February 2016 certification is Kristin Ruprecht. (*See* Exhibit P). However, Ms. Ruprecht has not worked for DWG or Defendant NASCO for several years.

73.     The certifications filed by Defendant NASCO to the Government on behalf of DWG are false. In order to qualify as a SDVOSBC, DWG's "management and daily business operations" must be "controlled by one or more service-disabled veterans." As detailed above, Defendant GAIC used its control over Relators' assets to force them into a deal with Defendant NASCO, and then Defendant NASCO intentionally stripped Relator Gose of all control of DWG in September 2012. Defendants are fully aware that Relator Gose has been shut out of all managerial and operational roles at DWG. DWG has been reduced to a shell corporation, which is in existence solely so Defendants can fraudulently obtain set-aside task orders from the Government. Defendants control DWG in all aspects of its operations, while collecting nearly all of the profits and financial benefits of its federal set-aside contracts and task orders.

74.     Relators estimate that Defendants' fraudulent actions have caused at least $75 million in damages to the United States.

### COUNT I
### VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729-33

75.     Relators incorporate paragraphs 1 through 74 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the FCA.

76.     As described in greater detail above, Defendants conspired to abuse the Small Business Administration's 8(a) Program and the Veterans Administration's Service-Disabled

Veteran-Owned Small Business Procurement Program Small Business Set-Aside Program. Defendants submitted or caused to be submitted false certifications of compliance to the SBA in order to participate in and bid on contracts set-aside for 8(a) businesses and SDVOSBCs, even though Defendants were ineligible. Lawful status as an 8(a) business and/or an SDVOSBC is a specified condition of payment under the contracts identified above.

77.     Under the FCA, Defendants have therefore violated:

i.      31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii.     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

iii.    31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B).

78.     Because of Defendants' false claims, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015 and $10,781 to $21,563 for each such claim submitted after November 2, 2015.

## PRAYER

WHEREFORE, Relators Dennie Gose and Brent Berry, on behalf of the United States, respectfully request that:

a.      This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

22

      b.     This Court enter an order requiring Defendants to pay an amount equal to three times the amount of damages to the United States, plus a civil penalty against Defendants of $5,500 to $11,000 for each such claim submitted on or before November 2, 2015 and $10,781 to $21,563 for each such claim submitted after November 2, 2015;

      c.     This Court enter an order requiring that Defendants cease and desist from violating the FCA;

      d.     This Court enter an order requiring Defendants to pay all expenses, attorney's fees and costs associated with this action pursuant to 31 U.S.C. § 37309d)(1);

      e.     This Court enter an order paying Relators Dennie Gose and Brent Berry the maximum statutory award for their contributions to the prosecution of this action pursuant to 31 U.S.C. § 3730(d); and

      f.     Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFFS/RELATORS DEMAND A TRIAL BY JURY ON ALL COUNTS**

Dated December 15, 2016.

Respectfully submitted,

JESSE L. HOYER
Florida Bar No.: 076934
jlhoyer@jameshoyer.com
CHRISTOPHER CASPER
Florida Bar No.: 048320
ccasper@jameshoyer.com
JAMES HOYER, P.A.
4830 W. Kennedy Blvd.
One Urban Centre, Suite 550

Tampa, Florida 33609
Tel.: 813-397-2300
Fax: 813-397-2310

**Counsel for Relators**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by Certified Mail, Return Receipt Requested, this _15th_ day of December, 2016 to the following:

The Honorable Loretta E. Lynch
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

A. Lee Bentley, III, United States Attorney
United States Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, FL  33602

Civil Process Clerk
United States Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, FL  33602

JESSE L. HOYER