# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

*ex rel.* DENNIE GOSE and
BRENT BERRY,

        Relators,

v.                        Case No. 8:16-cv-3411-SCB-AEP

NATIVE AMERICAN SERVICES
CORPORATION and GREAT
AMERICAN INSURANCE GROUP,
INC. d/b/a GREAT AMERICAN
INSURANCE COMPANY,

        Defendants.
_____/

# O R D E R

**THIS CAUSE** comes before the Court on the following:

- Defendant Native American Services Corporation's ("NASCO")
  Motion to Dismiss Amended Complaint and incorporated
  memorandum of law (Doc. 85);

- Defendant Great American Insurance Company's ("GAIC")
  Motion to Dismiss Amended Complaint and incorporated
  memorandum of law(Doc. 86);

- Relators, Sean Gose ("Gose") and Brent Berry's ("Berry")
  (collectively "Relators"), Opposition to Defendant NASCO's
  Motion to Dismiss (Doc. 87);

- Relators' Opposition to Defendant GAIC's Motion to Dismiss (Doc. 88); and

- Defendant GAIC's Reply in Support of its Motion to Dismiss (Doc. 91).

For the reasons explained below, Defendants' Motions are due to be granted.

## I. BACKGROUND AND STATEMENT OF THE CASE

Relators' First Amended Complaint ("FAC") brings three counts against Defendants, GAIC and NASCO, for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1)(A)-(C). More specifically, Relators assert the following three types of FCA violations against each Defendant: (a) a false presentment claim; (b) a false record claim; and (c) a conspiracy claim. (Doc. 76, FAC, Counts I-VI, ¶¶ 238-40, 244-46, 250-60).

Gose, a disabled Vietnam War veteran, was the founder and Chief Executive Officer of DWG & Associates, Inc. ("DWG"), an architectural and construction business. (FAC, ¶¶ 18, 67-68). Gose owned 51% of DWG's shares. (*Id.*, ¶ 18). Based on Gose's disadvantaged status, DWG was admitted as a "participant" to the United States Small Business Administration's ("SBA") 8(a) business Development Program ("8(a) or 8(a) Program") in 2004, and successfully competed for several 8(a)-set-aside multiple-award or "indefinite-delivery,

indefinite-quantity" ("IDIQ") construction contracts. (*Id.*, ¶¶ 69-70, 73).[1] While

DWG held those contracts, it was eligible to compete among a small pool of 8(a)

"concerns" (or pre-approved applicants) for future "task order" contracts for

defined services. Beginning in 2004, GAIC wrote bonds for DWG's successful

task order contracts, potentially putting itself on the hook for millions of dollars if

DWG defaulted on its obligations. (*Id.*, ¶¶ 71, 74).[2] Gose and Berry (who worked

as DWG's Chief Financial Officer from 2002 until 2012 and owned 49 percent of

DWG's shares) and their spouses entered into an indemnity agreement with GAIC,

putting up their personal assets, including their homes, as collateral for those

bonds. (*Id.*, ¶¶ 19, 68, 71, 196).

Due to DWG's success in winning 8(a) contracts, by early 2010, it outgrew

the 8(a) Program's size limits. (*Id.*, ¶ 72). DWG's growth meant it graduated from

---

[1]   To bid on 8(a) set-aside contracts, a business must not only be "small" at the time of the bid, but must also be both 51% unconditionally owned, and also controlled, by the disadvantaged individual upon whom 8(a) status rests. And that individual must maintain that unconditional ownership and control throughout the duration of the contract unless the business seeks and obtains a waiver from the SBA. 13 C.F.R. § 124.515 (1998). "An approved 8a participant receives a program term of nine years from the date of the SBA's approval letter certifying admission into the program." 13 C.F.R. § 124.2 (2004). A participant that completes its nine year term in the 8a program is deemed to graduate from the program and the nine year term may be shortened only by termination, early graduation or voluntary graduation. *Id.*

[2]   Federal law requires all contractors awarded federal construction contracts to furnish the government with performance and payment bonds. *See* 48 C.F.R. § 52.228-15. Federal law recognizes the broad discretion that sureties have to discharge their obligations to the federal government. *Hartford Fire Ins. v. U.S.*, 108 Fed. Cl. 525, 531 (2012).

the 8(a) Program and was no longer eligible to bid on new 8(a) set-aside multiple-award contracts. (*Id.*). Relators allege that 8(a) Program rules, however, allowed DWG to continue to bid on individual task orders for the IDIQ contracts it had previously been awarded—but only if Gose retained both 51% unconditional ownership, and also control, of DWG. (*Id.*).

DWG's financial situation deteriorated after it graduated from the 8(a) program and, by June 2012, it was in danger of defaulting on its existing 8(a) task order contracts. (*Id.*, ¶ 75). If DWG defaulted, GAIC would have been on the hook for tens of millions of dollars in uncompleted projects. (*Id.*, ¶ 82). And through their indemnity agreements, Gose, Berry, and their spouses were at risk of financial ruin, including the loss of their homes. (*Id.*). After DWG disclosed the risk to GAIC, Relators allege, "GAIC froze DWG's bonding program and refused to issue further bonds without third-party indemnification of GAIC." (*Id.*, ¶ 79). DWG then sought an investor company to assist DWG in completing its existing contracts and help it to avoid default. (*Id.,* ¶¶ 76, 83). NASCO submitted a proposal for "teaming" agreements to assist DWG with completing its backlog of already-awarded 8(a) task orders and offered to partner with DWG on future 8(a) task orders as well. (*Id.*, ¶ 87). Relators allege that by early August 2012, GAIC stepped in, ordered DWG to stop negotiations with all other potential partners, and took

control of the negotiations with NASCO. (*Id.*, ¶ 103).

In September 2012, DWG, GAIC and NASCO entered a written agreement titled Management and Advisory Services Agreement (the "MAS Agreement"). (FAC, Ex. I at 1). This Agreement identified NASCO as a critical subcontractor that would provide DWG with management consulting and advisory services, and it identified GAIC as the surety that "shall provide all funding for, and pay for, all costs associated with" DWG's federal projects. (*Id.*, Ex. I at 1 & ¶ 15.c).

Next, GAIC, DWG, Gose, and Berry, along with their spouses, entered into a written agreement titled Forbearance, Settlement and Release Agreement (the "Forbearance Agreement"). (*Id.*, Ex. J). It recognized that GAIC had paid DWG over $11.5 million to fund its operations and had paid DWG's bank $1.35 million to purchase the operating loan on which DWG had defaulted. (*Id.*, Ex. J at 1-2). GAIC agreed to forbear enforcing its indemnification rights so long as the MAS Agreement remained in effect and it agreed to release Gose, Berry, and their spouses entirely upon completion of DWG's government contracts if Gose and Berry assisted Defendants under their various agreements. (*Id.*, Ex. J at 3-4 & ¶ 147).

Finally, NASCO, Gose, and Berry entered a written agreement titled Right of First Refusal and Option Agreement (the "Right of First Refusal"). (*Id.*, Ex. K).

It provided NASCO with the right to purchase Gose's 51 percent interest in DWG in the event of his death or disability or if he agreed to sell his shares to a third party. (*Id.*, Ex. K at 3-7). It also provided NASCO an option to purchase Berry's 49 percent interest without regard to death, disability, or an agreement to sell. (*Id.*)

Relators allege that "NASCO . . . knew that DWG was dependent on GAIC for surety bonds and NASCO to indemnify those bonds." (FAC, ¶ 223). NASCO further "knew that threatening to withdraw NASCO's indemnification of DWG's bonds would force DWG to comply with its instructions and strip Gose of the ability to control DWG." (*Id.*). Relators allege that Defendants conspired to use their extreme financial leverage over Gose to force him into the MAS Agreement, the Forbearance Agreement, and the Right of First Refusal.(*Id.*, ¶¶ 89-199). They allege Berry and DWG's attorney warned Defendants that these agreements "potentially violated SBA regulations requiring control by Gose as the economically and socially disadvantaged individual upon whom DWG's 8(a) eligibility depended." (*Id.*, ¶ 137; *see also id.*, ¶¶ 105, 225-26). NASCO allegedly acknowledged that it had been warned, but instead of working to make the agreements SBA-compliant, it complained that DWG's "attorney keeps visiting control facts . . . ." (*Id.*, ¶ 227).

Later in 2012, Berry was terminated from employment with DWG and he

sold his 49% ownership interest to NASCO. (FAC, ¶¶ 171, 196). From December 31, 2012 on, Berry was not affiliated or involved with DWG. (Id., ¶¶ 171, 183). Meanwhile, Gose maintained his 51% ownership in DWG and received a salary from DWG. (*Id.*, ¶¶ 172, 195).

Relators allege that once the MAS Agreement, the Forbearance Agreement, and the Right of First Refusal were finalized, NASCO took control of DWG's day-to-day operations and its long-term strategy, including deciding which government contracts to bid on. (*Id.*, ¶¶ 164-99). Relators allege NASCO knew it was required to notify SBA of DWG's change in ownership and control. Relators allege that the 8(a) Program's rules are clear that once Gose lost either unconditional ownership or control, DWG's 8(a) contracts were subject to mandatory termination, citing 13 C.F.R. § 124.515 (1998). And they allege that although 8(a) Program rules allow for a waiver of the termination requirement, that waiver must be requested by the 8(a) entity before the change in ownership or control. *Id.* § 124.515(c). Relators allege that NASCO, an experienced government contractor, knew the rules, because it "expressly incorporated SBA rules" into at least one of the agreements that stripped Gose of unconditional ownership of DWG. (FAC, ¶ 230). Nevertheless, Defendants allegedly made an affirmative decision not to seek a waiver, or otherwise inform SBA, of DWG's change in ownership and control, and

knowingly caused to be made or presented, to the United States bids and false records or statements material to bids. (*Id.*, ¶¶ 200-06, 222-37).

Relators contend that DWG's 8(a) contracts were, therefore, subject to mandatory, non-discretionary termination, which would have excluded it from consideration for future task orders under those contracts. (*Id.*, ¶¶ 200-04). But, because Defendants never notified the United States of the change in ownership and control, the contracts were not terminated. (*Id.*, ¶ 205). Instead, Defendants fraudulently bid on task orders under DWG's 8(a) contracts in DWG's name. (*Id.*, ¶¶ 207-21). Relators allege that the United States, unaware of the change in ownership and control, awarded DWG dozens of task order contracts. (*Id.*, ¶ 208).

Through their Motions to Dismiss, Defendants maintain that their actions lawfully supported DWG so the company's government-funded projects would not fail. They seek dismissal of the FAC, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), for failure to state a claim plausibly and particularly under any sections of the FCA. NASCO also seeks dismissal of the FAC under the FCA's Public Disclosure Bar. Relators oppose Defendants' motions in their entirety.

## II. STANDARD FOR DISMISSAL

In deciding a motion to dismiss under Rule 12(b)(6), a district court is required to view the complaint in the light most favorable to the plaintiff. *See*

8

*Murphy v. Fed. Deposit Ins. Corp.*, 208 F.3d 959, 962 (11th Cir. 2000) (citing

*Kirby v. Siegelman*, 195 F.3d 1285, 1289 (11th Cir. 1999)). The Federal Rules of

Civil Procedure do not require a claimant to set out in detail the facts upon which

he bases his claim. Instead, Rule 8(a)(2) requires a short and plain statement of the

claim showing that the pleader is entitled to relief in order to give the defendant

fair notice of what the claim is and the grounds upon which it rests. *See Bell*

*Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (citation omitted). As

such, a plaintiff is required to allege "more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965

(citation omitted). While the Court must assume that all of the allegations in the

complaint are true, dismissal is appropriate if the allegations do not "raise [the

plaintiff's] right to relief above the speculative level." *Id.* (citation omitted). The

standard on a Rule 12(b)(6) motion is not whether the plaintiff will ultimately

prevail in his or her theories, but whether the allegations are sufficient to allow the

plaintiff to conduct discovery in an attempt to prove the allegations. *See Jackam v.*

*Hospital Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986).

To survive dismissal pursuant to Rule 12(b)(6), "the complaint's allegations

must plausibly suggest that the plaintiff has a right to relief, raising that possibility

above a speculative level . . . ." *Redland Co. v. Bank of Am. Corp.*, 568 F.3d 1232,

1234 (11th Cir. 2009). Furthermore, when exhibits attached to a complaint

contradict the pleading's general and conclusory allegations, the exhibits govern.

*K.C.R. ex rel. Gill v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019).

Additionally, because the FCA is a fraud statute, a relator's complaint must

satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b),

which requires fraud to be pled with particularity. *Corsello v. Lincare, Inc.*, 428

F.3d 1008, 1012 (11th Cir. 2005) (quoting Fed. R. Civ. P. 9(b)); *United States ex

rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002).

Rule 9(b) is only satisfied where the complaint sets forth:

> (1) precisely what statements were made in what documents or oral
> representations or what omissions were made, and (2) the time and
> place of each such statement and the person responsible for making
> (or, in the case of omissions, not making) same, and (3) the content of
> such statements and the manner in which they misled the plaintiff, and
> (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citations

omitted). Additionally, "the actual submission of the claim must be pled with

particularity and not simply implied from the circumstances." *United States v.

Space Coast Med. Assocs.*, L.L.P., 94 F. Supp. 3d 1250, 1255 (M.D. Fla. 2015)

(citing *Corsello*, 428 F.3d at 1013); *see also Clausen*, 290 F.3d at 1311 (plaintiff

cannot "describe a private scheme in detail but then . . . allege simply and without

any stated reason for his belief that claims requesting illegal payments must have

10

been submitted . . . .").

## III. DISCUSSION

For the reasons that follow, the Court agrees with Defendants that Relators

fail to state claims for relief under §§ 3729(a)(1)(A)-(C) of the FCA:

### A. 31 U.S.C. § 3729(a)(1)(A)
### (Relators' False Presentment Claim)

Counts I and II of the Amended Complaint allege that NASCO and GAIC,

respectively, violated 31 U.S.C. § 3729(a)(1)(A). "To establish a cause of

action under § 3729(a)(1)(A), a relator must prove three elements: (1) a false or

fraudulent claim, (2) which was presented, or caused to be presented, for payment

or approval, (3) with the knowledge that the claim was false." *United States ex rel.*

*Phalp v. Lincare Holdings, Inc*., 857 F.3d 1148, 1154 (11th Cir. 2017). The Court

agrees with Defendants that the FAC fails to allege these essential elements.

### <u>i. Falsity (first element)</u>

The falsity element of Relators' claim stems from their mistaken contention

that the MAS Agreement and the Forbearance Agreement, entered into in 2012,

destroyed Gose's control of DWG under 13 C.F.R. §§ 124.106 and that the Right

of First Refusal destroyed Gose's unconditional ownership under § 124.105. (FAC,

76 ¶¶ 39-45), leaving Defendants with ownership and control over DWG. Relators

contend that by failing to disclose DWG's change in ownership and/or control and

11

then bidding on additional task orders, Defendants fraudulently induced task order awards and thereby violated the FCA. (FCA, ¶¶ 15, 208, 239-40, 245-46). Relators fail to establish the falsity element inasmuch as Gose remained the majority owner of DWG (held 51% of the DWG stock) after the execution of these agreements. (FAC, ¶¶ 193, 195; Ex. K at 3, 4). Furthermore, neither § 124.106 nor § 124.105 created an obligation on the part of Defendants to notify the SBA of their involvement with DWG and thus, they do not provide Relators with support in establishing the falsity element.

Section 124.106 focuses on control at two stages: when a business applies for admission to the 8(a) Program and when a business is a "Participant" in the program. Specifically, the regulation provides that "[a]n applicant or Participant must be managed on a full-time basis by one or more disadvantaged individuals who possess requisite management skills." 13 C.F.R. § 124.106(a)(1). On the facts pled in the FAC, however, this regulation was not applicable to DWG in 2012.

As Defendants assert, the purpose of the 8(a) Program is to assist small, disadvantaged businesses to compete for government contracts. 13 C.F.R. § 124.1. The program utilizes a nine-year term, after which a "Participant" graduates. 13 C.F.R. § 124.2. A Participant that achieves its growth objectives and so no longer qualifies as small prior to the expiration of its nine-year term graduates early. 13

12

C.F.R. § 124.302. Once a Participant graduates early, it is no longer eligible to receive any assistance under the program. 13 C.F.R. § 124.304(f). It is, however, obligated to complete its previously awarded contracts, which permits the contractor to bid on additional task orders where the contract preapproved it to do so. 13 C.F.R. § 124.30(f)(1).

Relators admit that two years before DWG's insolvency, it had grown beyond the size that would permit it to remain in the 8(a) program and that it was no longer eligible to bid on new 8(a) contracts. (FAC, ¶¶ 6, 72). As such, DWG necessarily admits that it graduated from the 8(a) Program early. *See* 13 C.F.R. § 124.302(a)(1), (d) (early graduation for exceeding size standard*); see also A1 Procurement, LLC v. Thermor, Inc.*, 2017 WL 2881350, at *6 (E.D. Va. Jul. 5, 2017) (contractor who received notice SBA intended to early graduate contractor but who was not actually early graduated remained eligible to obtain new 8(a) set-aside contracts).

Defendants correctly argue that Relators ignore the legal consequence of DWG's early graduation. "Participant" is defined as "a small business concern admitted to participate in the 8(a) Program." 13 C.F.R. § 124.3. After 2010, DWG was no longer a small business, and it was no longer admitted to the program. Therefore, it was no longer a Participant. *See, e.g., Size Appeal of: FTSI-Phelps JV*,

13

SBA No. SIZ-5583, 2014 WL 4804769, at *8–9 (Aug. 19, 2014) (affirming SBA area office's ruling that appellant was no longer an 8(a) Participant because it had graduated from the 8(a) program); *In re Reality Techs., Inc.*, SBA No. BDP-455, 2012 WL 8134444, at *2 n.2 (Nov. 21, 2012) (noting that graduate was a "former participant" and thus "considered a non-disadvantaged firm"); *In re David's Custom Roofing & Painting, Inc.*, SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010) (graduate was no longer an 8(a) program participant). There is no post-graduation point when the business leaves the 8(a) Program. The plain meaning of §124.3 is clear.

Because DWG was no longer a Participant in the 8(a) program in 2012, the control requirements of § 124.106(a)(1) did not apply to DWG when, in 2012, any change in control alleged by Relators occurred as a result of the MAS Agreement and the Forbearance Agreement. At that point, Defendants were under no obligation to notify the SBA of their involvement with DWG. Therefore, Relators' causes of action under 31 U.S.C. § 3729(a)(1)(A), in Counts I and II of the FAC, are due to be dismissed to the extent they rely on 13 C.F.R. § 124.106 to establish falsity and to contend that the 2012 written agreements made DWG ineligible for the 8(a) Program.

With respect to ownership, Relators allege that the Right of First Refusal

14

destroyed Gose's ownership of DWG and made the company ineligible to participate in the 8(a) Program. However, Relators once again mistakenly rely on an inapplicable regulation. 13 C.F.R. § 124.105 states that "[a]n applicant or Participant must be at least 51 percent unconditionally and directly owned by one or more socially and economically disadvantaged individuals . . . ." 13 C.F.R. § 124.105 (2012). But, this regulation applies only to applicants and Participants, and DWG was neither after 2010. As a result, the 2012 written agreements could not have caused DWG to become ineligible. It was no longer a "Participant" in the 8(a) Program by 2012 and, therefore, Defendants were under no obligation to notify the SBA of their involvement with DWG.

Defendants correctly argue that Relators' ownership contentions also fail for a second reason. Section 124.105 requires unconditional ownership, a defined term under the SBA regulations:

> Unconditional ownership means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

13 C.F.R. § 124.3 (2012). The SBA regulations further provide:

15

> In determining unconditional ownership, SBA will disregard any
> unexercised stock options or similar agreements held by
> disadvantaged individuals. However, any unexercised stock options or
> similar agreements (including rights to convert non-voting stock or
> debentures into voting stock) held by non-disadvantaged individuals
> will be treated as exercised, except for any ownership interests which
> are held by investment companies . . . .

13 C.F.R. § 124.105(e).

In light of these two provisions, even if the ownership requirement applied to DWG in 2012, the Right of First Refusal did not destroy Gose's unconditional ownership of DWG. (*See* FAC, Ex. K). It did not alter Gose's 51 percent ownership of DWG's stock. (*See id.*). Nor did it subject his ownership to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another—other than after death or incapacity, as the regulations authorized. (*See id.*). The Right of First Refusal permitted NASCO to purchase Gose's stock if he agreed to sell it to a third person, and then only on the same terms. (*See id.*). Therefore, it arises, if at all, only after the owner has already agreed to sell to a third person and, thus, could not hinder Gose's unconditional ownership in any manner described in §§ 124.3 or 124.105(e). *Veterans Contracting Grp., Inc. v. United States*, 133 Fed. Cl. 613, 622–23 (Fed. Cl. 2017) (court expressly utilized § 124.105 and enjoined SBA from

16

finding a contractor ineligible under the 8(a) Program based on a similar right of first refusal because such a right does not eliminate unconditional ownership as defined by the SBA regulations). *See also Miles Constr., LLC v. United States*, 108 Fed. Cl. 792, 801–03 (2013) (setting aside agency decision that a right of first refusal destroyed unconditional ownership).

In sum, § 124.106 is inapplicable because, by 2012, the company was no longer a Participant in the 8(a) Program. Even if that provision were to apply, the Right of First Refusal did not destroy Gose's unconditional ownership within the meaning of §§ 124.3 or 124.105(e). For both reasons, Relators' causes of action under 31 U.S.C. § 3729(a)(1)(A), in Counts I and II of the FAC, are due to dismissed with prejudice to the extent they rely on § 124.106 to establish falsity and contend that the Right of First Refusal made DWG ineligible for the 8(a) Program.

### ii. Presentment (second element)

The Eleventh Circuit has held that the submission of a claim is "the *sine qua non* of a False Claims Act violation." *Clausen*, 290 F.3d at 1311. A relator must, therefore, provide details regarding the submissions' contents—"the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions." *Corsello*, 428 F.3d at 1014. There are three theories of liability under the FCA regarding false claims for

payment: (1) an express false certification, (2) an implied false certification, and (3) fraudulent inducement. *See, e.g., United States ex rel. Lorona v. Infilaw Corp.*, 2019 WL 3778389, at *16-17 (M.D. Fla. Aug. 12, 2019). In responding to the Motions to Dismiss, Relators concede that they are only proceeding on a fraudulent inducement theory in connection with DWG's alleged inability to obtain new task orders. (Doc. 87 at 28; Doc. 88 at 10).

The Court agrees with Defendants that Relators fail to plead a fraudulent inducement theory both cognizable under the FCA and compliant with Rule 9(b). Relators vaguely allege that DWG submitted "false bids" for additional task orders without revealing that the company was supposedly no longer eligible for the 8(a) Program due to Gose's alleged loss of control and ownership. (FAC, ¶¶ 207, 239-40). Relators claim that by bidding on the task orders, Defendants "fraudulently induced, and/or caused DWG to fraudulent[ly] induce, the United States to award task orders under the 8(a) contracts to DWG." (*Id.*, ¶ 209). These allegations are insufficient to state a claim.[3]

Fraudulent inducement with regard to bidding on a government contract, as distinguished from submitting a claim for payment under the contract, is not

---

3   Relators appear to concede their fraudulent inducement theory fails to assert presentation of a false claim under § 3729(a)(1)(A) in arguing their theory "at the very least" alleges a claim under § 3729(a)(1)(B). (*See* Doc. 88 at 10-11 n.4).

available as a cause of action under the FCA. *See generally, Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 190 (2016). In *Escobar*, the Supreme Court confirmed that "[t]he False Claims Act is not 'an all-purpose antifraud statute'" that captures any "fraud" associated with a government contract. 579 U.S. at 194. Rather, the FCA imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The falsity or fraudulent conduct must, therefore, be found in a claim for payment.

In light of *Escobar*, *Clausen*, and a reading of the plain text of the FCA, a fraudulent inducement claim satisfies § 3729(a)(1)(A) only where the alleged falsity extends to a claim for payment. Relators are unable to set forth any such connection. They offer no showing of any falsity that extended to the task order payment requests at issue here. Even if Relators had alleged an actionable fraud, their claims fail under the particularity standards of Rule 9(b). Such particularity requires the pleader to set forth the who, what, where, when, and how surrounding the supposedly false or fraudulent claims and Relators have failed to provide such information regarding (1) the bids that were supposedly fraudulent, and (2) the claims for payment supposedly at issue. Relators cannot do so and instead argue "details of the bids are not necessary, because bidding itself was fraudulent, not the

19

specific representations made in the bids." (Doc. 87 at 32 n.12). Relators identify a purportedly representative sample of task orders (*see* FAC, ¶ 210), but the government-issued task orders are not alleged to have been fraudulent. In sum, Relators' fraudulent inducement claim improperly seeks to use the FCA as an all-purpose antifraud statute. Therefore, Relators' causes of action under 31 U.S.C. § 3729(a)(1)(A), in Counts I and II of the FAC, are due to dismissed with prejudice to the extent they rely on a claim of fraudulent inducement.

### iii. Knowledge (third element)

Finally, because Relators cannot prove the first two elements of a cause of action under § 3729(a)(1)(A)—(1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval—they consequently cannot prove the third element—that the claim was presented with knowledge of its falsity.

### B. 31 U.S.C. § 3729(a)(1)(B)
### (Relators' False Record Claim)

Counts III and IV assert that NASCO and GAIC, respectively, violated 31 U.S.C. § 3729(a)(1)(B), which makes it unlawful to knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim. *Phalp*, 857 F.3d at 1154. Relators base their § 3729(a)(1)(B) claims on the same doomed allegations that form the basis for their § 3729(a)(1)(A) claims—that

20

DWG fraudulently induced the United States to award it task orders by not disclosing Gose's supposed loss of ownership and control. (FAC, ¶¶ 247-49).

Furthermore, although claims under § 3729(a)(1)(B) do not require Relators to allege that the defendant submitted a false claim to the government, Relators must still plead a connection between the alleged false record or statement and an actual claim made to the government, and the failure to allege a false claim submitted to the government is also a failure to allege facts showing that false statements were material to a false claim. *Phalp*, 857 F.3d at 1154. Relators plead no details regarding any claim, and they plead no details regarding any task order or bid. They simply assert that DWG should have disclosed its purported change in ownership or control, an obligation not connected to any particular bid or claim for payment. For these reasons, Relators' § 3729(a)(1)(B) cause of action does not plausibly, or particularly, state a claim, and it is due to be dismissed with prejudice.

## C. 31 U.S.C. § 3729(a)(1)(C)
### (Relators' Conspiracy Claim)

In Count VI, Relators attempt to bring a conspiracy claim against GAIC under § 3729(a)(1)(C). To plead an FCA conspiracy, a relator must allege: "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered

21

damages as a result of the false or fraudulent claim." *Corsello*, 428 F.3d at 1014.

The existence of a false claim is essential to an FCA conspiracy claim. *See, e.g., United States v. LifePath Hospice, Inc*., 2016 WL 5239863, at *9 (M.D. Fla. Sept. 22, 2016), *aff'd sub nom. United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783 (11th Cir. 2018). Thus, if the Court dismisses Relators' claims under § 3729(a)(1)(A)-(B), then the Court should dismiss the conspiracy claim as well. *Id.* The Court has dismissed Relators' § 3729(a)(1)(A)-(B) with prejudice.

Furthermore, as with other FCA elements, "a plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009). Relators fail to do so. *See Corsello*, 428 F.3d at 1014 (dismissing conspiracy claim under Rule 9(b)).

Relators fail to identify with particularity any agreement that was made to defraud the United States regarding task orders, when it was made, and who actually made it. (FAC, ¶¶ 83-199). Relators overlook that DWG was already ineligible for new contracts and they say nothing about a conspiracy to seek task orders for which DWG was supposedly not eligible. No conspiracy is shown—let alone shown with particularity. *E.g., United States ex rel. Carroll v. JFK Med.*

22

*Ctr.*, 01-8158-CIV, 2002 WL 31941007, at *5 (S.D. Fla. Nov. 15, 2002) (citing *Lombard's Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985)). Relators' § 3729(a)(1)(C) claim is, therefore, due to be dismissed with prejudice.

## IV. CONCLUSION

After Defendants originally moved to dismiss this case (Docs. 70-71), Relators filed the FAC, but for the foregoing reasons the Court finds that the pleading deficiencies in the original complaint were not corrected: no claim is stated, nor can one be plausibly stated, let alone stated with the requisite particularity.[4] Any further efforts by Relators to amend the complaint would be an exercise in futility. As a result, the FAC is due to be dismissed with prejudice.

**ACCORDINGLY**, it is **ORDERED AND ADJUDGED**:

1. Defendant Native American Services Corporation's Motion to Dismiss Amended Complaint (Doc. 85) and Defendant Great American Insurance Company's Motion to Dismiss Amended Complaint are **GRANTED**.

2. This case is **DISMISSED WITH PREJUDICE**.

3. The Clerk is directed to terminate any pending motions and close this

---

4   As such, this Court need not reach Defendant NASCO's additional argument that dismissal of the FAC is required under the FCA's Public Disclosure Bar.

23

case.

**DONE AND ORDERED** at Tampa, Florida, this 14th day of November, 2022.

SUSAN C. BUCKLEW
United States District Judge