UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA *ex rel.*
SEAN GOSE, as Personal Representative
of the Estate of Dennie Gose, and
BRENT BERRY,

    Plaintiffs,

v.                                    Case No. 8:16-cv-03411-KKM-AEP

NATIVE AMERICAN SERVICES
CORPORATION and GREAT
AMERICAN INSURANCE GROUP,
INC.,

    Defendants.
_____

## ORDER

In 2016, Brent Berry and Dennie Gose sued the defendants on behalf of the United States for violations of the False Claims Act (FCA). When Dennie died, his son, Sean Gose, assumed Dennie's authority as relator to prosecute the action. After nearly a decade of litigation but still without a trial in sight, the defendants move for judgment on the pleadings, arguing that the FCA's qui tam provision contravenes Article II. *See* Mot. for J. on the Pleadings (MJP) (Doc. 113) at 8–25. For the

reasons I explained in *United States ex rel. Zafirov v. Florida Medical Associates, LLC*, the FCA qui tam provision violates the Appointments Clause. 751 F. Supp. 3d 1293 (M.D. Fla. 2024). That same analysis controls here. I write to point out how Sean Gose's appointment proves that a relator occupies a "continuing position" as an officer of the United States because the relator role is not personal to him.

I. BACKGROUND

Beginning in 1995, Dennie Gose owned and controlled a construction company named DWG & Associates. Am. Compl. (Doc. 76) ¶ 68. In 2004, the Small Business Administration accepted DWG into the 8(a) program, which requires a business be "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." *Id.* ¶ 69; 13 C.F.R. § 124.101. DWG met the ownership and control requirements because Dennie—who qualified as socially and economically disadvantaged—owned 51% of DWG's shares and controlled the company. Am. Compl. ¶ 69; *see* 15 U.S.C. § 637(5), (6)(A) (defining "socially disadvantaged" and "economically disadvantaged"); 13 C.F.R. §§ 124.103(a), 124.104(a) (same).

Through the set asides for 8(a) participants, DWG secured several Indefinite-Delivery Indefinite-Quantity (IDIQ) contracts,[1] allowing DWG to bid for "task orders." Am. Compl. ¶ 73. Under an indemnification agreement, Defendant Great American Insurance Company (GAIC) agreed to serve as DWG's surety on these contracts. *Id.* ¶ 71.

By 2012, DWG "was insolvent and in danger of defaulting on its loans." *Id.* ¶ 75. GAIC advanced costs to DWG, but eventually refused to issue further bonds to DWG without third-party indemnification of GAIC. *Id.* ¶¶ 77–80. Greatly indebted to GAIC and looking for partners to assist in performing its government contracts, Berry, DWG's then-Chief Financial Officer, turned to other construction companies, including Native American Services Corporation (NASCO). *Id.* ¶ 83. Eventually, the relators allege that GAIC and NASCO conspired to seize ownership and control of DWG from Dennie. *Id.* ¶¶ 83–197. According to the relators, GAIC and NASCO failed to inform the government of DWG's change in ownership and control or to seek a waiver of the regulation requiring that an economically and socially disadvantaged individual own and control the participating business. *Id.*

---

[1] "An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements." 48 C.F.R. § 16.504(a).

¶¶ 202–03; *see* 13 C.F.R. § 124.515. NASCO continued to bid on and win task orders in DWG's name. *Id.* ¶¶ 207–18.

Based on the above, Dennie and Berry filed this FCA action in 2016, alleging that GAIC and NASCO knowingly presented false claims to the government, knowingly used false statements material to getting false claims paid, and conspired to submit false claims through DWG. *Id.* ¶¶ 238–70. The government declined to intervene in the case. (Doc. 29).

A few years into the litigation, Dennie passed away. (Doc. 36) at 1. In 2020, a state court judge appointed Dennie's son, Sean, as the personal representative of Dennie's estate, (Doc. 36-1) at 1–3, and Sean took over Dennie's relator role in this federal case, (Doc. 37).

After a colleague of mine granted the defendants' motions to dismiss the relators' claims, (Doc. 94), the Eleventh Circuit reversed, holding that the relators' "complaint plausibly alleges false presentment, false statement, and conspiracy claims under 31 U.S.C. § 3729(a)(1)(A)–(C)," *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1320 (11th Cir. 2024). On remand and upon reassignment, the defendants move for a judgment on the pleadings, borrowing heavily from arguments raised in the *Zafirov* litigation. MJP. The relators oppose, Resp. (Doc.

4

121), and the government intervenes for the limited purpose of defending the constitutionality of the FCA's qui tam provision, (Docs. 129 & 132).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001).

## III. ANALYSIS

The defendants argue that the FCA's qui tam provision violates Article II in several respects. *See* MJP at 8–25. Because the FCA qui tam provision defies the Appointments Clause, I do not reach the defendants' arguments under the Vesting and Take Care Clauses.

The Appointments Clause specifies the permissible methods of appointment for "Officers of the United States." *See* U.S. CONST. art. II, § 2, cl. 2. The default method for the appointment of all officers is "nomination by the President and confirmation by the Senate." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021). For so-called principal officers, this is the only permissible method of appointment.

5

*See id.* As for "inferior Officers," Congress may by law vest their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2.

To be an officer, not a mere employee, of the United States requires an individual to "exercise significant authority pursuant to the laws of the United States," *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)), and "occupy a 'continuing' position established by law," *id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)).

The original relators, Dennie and Berry, were not appointed under any of the Appointments Clause's methods, and neither was Sean. No party contends otherwise. Dennie and Berry assumed the role of relator by filing this action, and the court substituted in Sean, as personal representative of Dennie's estate, after Dennie passed away. To defend their authority to prosecute fraud allegations on behalf of the United States, Sean and Berry raise four arguments. First, the relators point to Founding-era history. Resp. at 4–5. Second, the relators argue that the Appointments Clause does not apply because "*qui tam* relators are not government employees." *Id.* at 5–6. Third, the relators dispute that they hold a "continuing

6

position." *Id.* at 6–7. Fourth, the relators contend that they do not exercise "significant authority." *Id.* at 7–8.

I rejected these arguments in *Zafirov*. A relator obviously exercises "significant authority" when prosecuting FCA actions on behalf of the United States—indeed, a relator wields core executive power when pursuing crushing monetary penalties against private entities to benefit the federal fisc. *Zafirov*, 751 F. Supp. 3d at 1309. And the Constitution does not "permit Congress to avoid the Appointments Clause altogether by vesting executive power outside the government." *Id.* at 1322 n.8 (quoting *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, No. 23-5129, 2023 WL 4703307, at *4 (D.C. Cir. July 5, 2023) (Walker, J., concurring)). Nor do the relators here identify new Founding-era history to tilt the merits in their favor. *See id.* at 1317–22 (explaining why the "historical pedigree of qui tam provisions does not save [an FCA relator] from qualifying as an officer under Supreme Court precedent"). This leaves the relators' argument that they do not hold a "continuing position," which implicates a body of caselaw without many clear answers. But this precedent does teach that an impersonal, statutorily defined position is likely "continuing." The very fact that Sean Gose—not Dennie, the original relator—is a party to this action proves that qui tam relators occupy a continuing office.

7

One of the (admittedly more amorphous)[2] attributes of an "Office[] of the United States" is that its "duties continue" even "though the person be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.). When the duties continue, "it seems very difficult to distinguish . . . the person who performs the duties from an officer." *Id.*; *see United States v. Donziger*, 38 F.4th 290, 297 & n.3 (2d Cir. 2022). Although the Supreme Court has never defined the exact contours of what constitutes a "continuing position,"[3] the impersonal nature and interchangeability of the individual to the role remains a touchstone, as the government and relators readily embrace. *See* USA Br. in Opp'n (Doc. 132) at 12–14; Resp. at 6–7. The office of FCA relator, as this case makes clear, bears those hallmarks.

---

[2] Some commentators have questioned whether a "continuing" requirement is consistent with the original meaning of the Appointments Clause. *See* E. Garrett West, *Clarifying the Employee-Officer Distinction in Appointments Clause Jurisprudence*, 127 YALE L.J. FORUM 42, 50–56 (2017) (characterizing this requirement as an "extra-constitutional appendage passed down from errant language in [*United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823)] and reinforced in the post-Civil War cases" and proposing to replace it with an "alters-legal-rights" test). At minimum, the risk of Congress vesting core executive power in a rotating cast of temporary officials to affect an "end-run around the Appointments Clause" suggests that the continuity requirement should be applied cautiously. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 317 (2017) (Thomas, J., concurring).

[3] The "continuing position" inquiry also focuses on statutory duties, powers, and emoluments. In *Zafirov*, I explained at length how the FCA defines all three for a relator, so I do not belabor those points again. *Zafirov*, 751 F. Supp. 3d at 1313–14.

8

The relators and the government argue that the qui tam provision makes the relator role personal to the individual that initially sued. Resp. at 6–7; USA Br. in Opp'n at 14–16. But the FCA itself proves that the role of relator is not conditioned on anything unique to the first-to-sue individual, such that many others could potentially have occupied the role. To begin, the statute empowers (almost) any "person" to file an FCA action if the individual can allege the facts of a fraud. 31 U.S.C. § 3730(b)(1). Anyone—whether he or she worked for DWG, one of the defendants, or some other company—who possessed the requisite knowledge could have initiated this fraud action. *Id.* § 3730(e)(4). That vastly expands the universe of potential occupants of the position of relator in this very action.

Had Dennie (or Sean) and Berry abandoned the action or a court otherwise dismissed the action without prejudice, normal preclusion rules and the public disclosure bar would be the only barriers arising from that prior action to someone else assuming the role of relator against these defendants. *See id.* § 3730(e)(4)(A). The FCA itself does not prohibit someone—from the nearly universal pool of potential "persons"—from bringing an action concerning the same circumstances. Instead, the statute merely pretermits duplicative actions. *Id.* § 3730(b)(5); *see Kellogg Brown & Root Sers., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 662

9

(2015) (concluding that, under § 3730(b)(5), "an earlier suit bars a later suit while the earlier suit remains undecided but ceases to bar that suit once it is dismissed").

Next, that the qui tam provision makes the relator role transferable cuts in favor of continuity. As I have pointed out before, precedent permits the alienability of a relator's interest, at least in some circumstances.[4] Relevant here, when the original relator dies, a federal court may replace the relator with his estate's personal representative. *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993), *as amended* (Jan. 12, 1994) (holding that "a relator's *qui tam* action survives his death" and permitting substitution of the personal representative of the estate). Because of this holding, Sean was able to step into his father's shoes and exercise the power to "represent the interests of the United States" in this case. *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1102 (11th Cir. 2020). In other words, after his death, Dennie was "replaced with someone else holding the same position." Resp. at 6. In this way, the duties of Dennie's office " 'continue[d] even 'though the person' performing [his

---

[4] Along with substitution, Eleventh Circuit precedent allows a relator to assign a portion (at least) of his potential recovery to a third party. *See Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1102 (11th Cir. 2020) (concluding that the FCA does not prevent a relator from assigning a portion of her potential recovery to a third-party litigation funder). Other circuits permit alienability in other forms. For example, in the Fifth Circuit, when a relator files for bankruptcy, a bankruptcy trustee can sometimes proceed in the relator's place. *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 361–64 (5th Cir. 2014).

duties]" changed. USA Br. in Opp'n at 14 (quoting *Maurice*, 26 F. Cas. at 1214). According to the relators and the government, this fact should be nearly conclusive to the continuity inquiry. *See id.* at 12, 14; Resp. at 6–7.

The relators argue that Sean's substitution proves the opposite. Resp at 7 n.2. Since "government positions" "cannot be inherited," Sean's substitution proves that a relator is not a "government position." *Id.* The relators continue: when "a special prosecutor or bank receiver dies, his or her heirs do not take over that job," but instead "the government appoints someone unrelated" to fill the position. *Id.* The government echoes the same argument. USA Br. in Opp'n at 16 (the duties of a government office "cannot be assigned and are not inherited by the official's estate").

That Sean came to wield executive power in a manner alien to republican government is a reason to *doubt* the constitutionality of the FCA's qui tam provision, not to be assured of it. Put differently, the relators and government do not contest that the duties of the relator in this case continued even though Sean stepped into Dennie's shoes. *But that proves the defendants' point.* If Congress decided tomorrow to make an ambassadorship inheritable and enacted a statute to that effect, this new provision would not make an ambassadorship any less of "an actual

11

government office," USA Br. in Opp'n at 16, or serve as a defense to the Appointments Clause challenge that would inevitably follow. The same is true here.

A relator is allowed to self-appoint and then, after a state judge appoints a personal representative and a federal judge grants a motion to substitute, the personal representative of the relator's estate takes office. That an FCA relator's replacement is dictated by a combination of state probate law and Federal Rule of Civil Procedure 25, rather than the Appointments Clause only, further confirms the unconstitutionality of the FCA's qui tam provision. In essence, this arrangement amounts to two constitutional violations rather than one. Article II's "chain of dependence" is broken not once, but twice. *Arthrex*, 594 U.S. at 11 (quoting 1 ANNALS OF CONG. 499 (1789) (J. Madison)). The Framers' limitations on the appointment power—intended to "ensure that those who wielded it were accountable to political force and the will of the people"—are circumvented all the way down, *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991).

## IV. CONCLUSION

Sean Gose exemplifies the impersonal nature of the position of relator, proving that it remains a "continuing position." And because a relator undeniably asserts core executive power by prosecuting claims on behalf of the United States, a

relator is an "Officer" of the United States and requires constitutional appointment as such.

That appointment did not occur here. In 2016, Dennie Gose and Brent Berry filed this FCA action "on behalf of the United States of America." Years later, Dennie passed away. But the duties Dennie undertook as a relator continued. Sean, Dennie's son, stepped into Dennie's shoes as personal representative of Dennie's estate to prosecute the action and, along with Berry, pursued substantial monetary penalties for an alleged harm to the public fisc. In both this Court and the Eleventh Circuit, Sean and Berry determined the legal arguments to make and crafted the theories of liability to pursue on behalf of the United States. Like all FCA relators, no one appointed Sean and Berry to this Article II office. As a result, I grant the defendants' motion for a judgment on the pleadings on the basis that Sean and Berry occupying the office of FCA relators violates the Appointments Clause. *See Zafirov*, 751 F. Supp. 3d at 1322–23.

Accordingly, the following is **ORDERED:**

1. The Defendants' Motion for Judgment on the Pleadings (Doc. 113) is **GRANTED**.

2. The Clerk is directed to **ENTER JUDGMENT** for the defendants and against Sean Gose and Brent Berry, which shall read "This case is dismissed with prejudice."

3. The Clerk is directed to terminate any pending motions and deadlines, and to **CLOSE** the case.

**ORDERED** in Tampa, Florida, on May 29, 2025.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge